UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

```
UNITED STATES OF AMERICA,   )
                            )  REDACTED
               Plaintiff,   )
                            )
vs.                         )  CAUSE NO: 1:21-cr-00193-JPH-DLP-1
                            )  Indianapolis, Indiana
                            )  July 22, 2021
JASON M. BETTS, et.al.,      )
                            )
               Defendants.) )
```

Before the

HONORABLE TIM A. BAKER, MAGISTRATE JUDGE

*TRANSCRIBED FROM ELECTRONIC SOUND RECORDING*

DETENTION HEARING

**TESTIMONY ONLY of MALINDA BETTS**

\* \* \* \* \*

FOR THE PLAINTIFF:  Mr. Bradley A. Blackington
                    UNITED STATES ATTORNEY'S OFFICE
                    10 West Market Street
                    Suite 2100
                    Indianapolis, Indiana 46204
                    bradley.blackington@usdoj.gov

FOR THE DEFENDANT:  Mr. Jack Crawford
                    CRAWFORD & DEVANE
                    1050 North College Avenue
                    Indianapolis, Indiana 46202
                    crawdevlaw@indy.rr.com


COURT REPORTER:     Jodie Franzen, RPR
                    United States District Court
                    46 East Ohio Street
                    Room 301
                    Indianapolis, Indiana 46204
                    jodie_franzen@insd.uscourts.gov

**BETTS - DIRECT/CRAWFORD**

 1                        *(In open court)*

 2            THE COURT:  All right, Mr. Crawford, any evidence

 3   you want to present?

 4            MR. CRAWFORD:  We do, Judge.  We would like to call

 5   Ms. Malinda Betts to the stand.

 6            THE COURT:  Please step forward.  We have a witness

 7   stand right over here, a witness chair, if you would come up

 8   here and then before you sit down and when you are right here

 9   I will have you stop and just raise your right hand.

10                        *(Witness sworn)*

11            THE COURT:  Okay.  Thank you.  You may have a seat

12   in that chair right there.

13            And when she is ready, you may inquire,

14   Mr. Crawford.

15            MR. CRAWFORD:  Thank you, Your Honor.

16        **MALINDA BETTS, DEFENDANT'S WITNESS, SWORN**

17                   <u>**DIRECT EXAMINATION**</u>

18   BY MR. CRAWFORD:

19        Q    Would you state your name for the record, ma'am, and

20   spell your first name and your last name.

21        A    MaLinda Betts, M-A-L-I-N-D-A, B-E-T-T-S.

22        Q    And how old are you, ma'am?

23        A    Forty-three.

24        Q    Ma'am, you are the mother of the defendant Jason

25   Betts; is that correct?

BETTS - DIRECT/CRAWFORD

1    A    Yes.

2    Q    And you reside at ████████████, Indianapolis,

3    Indiana --

4    A    Yes.

5    Q    -- is that correct?

6    A    Yes.

7    Q    Okay.  Did you raise Jason Betts as his mother?

8    A    Yes.

9    Q    And how far did Jason get in school?

10   A    Tenth.

11   Q    Here at John Marshal, here in Marion County?

12   A    Ninth.

13   Q    Ninth?

14   A    It might have been ninth.

15   Q    Okay.  Ma'am, the address, ████████████ is

16   that an apartment or a home?

17   A    Home.

18   Q    Okay.  How long have you lived there?

19   A    Almost two years.

20   Q    What do you do for a living, ma'am?

21   A    Certified nursing assistant and medical assistant.

22   Q    Okay.  Ma'am, was there a period of time when your

23   son Jason lived with you on Parkhill Drive?

24   A    No.

25   Q    Okay.  Would you be willing to allow him to live

**BETTS - DIRECT/CRAWFORD**

1    with you on Parkhill Drive should the Court decide that a

2    condition of pretrial release would be GPS monitoring home

3    detention?

4        A    Yes.

5        Q    You would be willing to have him live there.  Okay.

6             And was your son working at the time of his arrest

7    in this case?

8        A    Um, all I know, he was doing mobile detailing.

9        Q    He was doing what?

10       A    Mobile detailing.

11       Q    Okay.  To your knowledge, ma'am, has your son ever

12   been convicted of a felony offense?

13       A    No.

14       Q    He has a couple of juvenile matters in his history,

15   right?

16       A    Correct.

17       Q    And I believe he has a criminal record of one

18   conviction in 2019 for a misdemeanor possession of marijuana

19   in Hancock County.  Is that your understanding?

20       A    Correct.

21       Q    And for that he received a suspended jail sentence

22   and one year probation, correct?

23       A    Correct.

24       Q    Do you believe, ma'am, that your son, if he should

25   reside with you in Parkhill Drive, or at Parkhill Drive, would

**BETTS - DIRECT/CRAWFORD**

1    follow your instructions?

2              THE COURT:  Mr. Crawford, I'm looking at the PS3,

3    and maybe I'm looking at this wrong, but on page 3 I see a

4    felony conviction, he was 16, but it looks like it was handled

5    in the Marion Superior Court.

6              MR. CRAWFORD:  It looks like it was handled as a

7    juvenile matter, Judge, I believe.

8              THE COURT:  It doesn't say that.

9              MR. BLACKINGTON:  It says FD, instead of JD, which

10   would indicate adult court.

11             THE COURT:  Right.

12             MR. CRAWFORD:  I don't -- that's not an adult

13   conviction, I don't believe, Judge.

14             THE COURT:  Well, it doesn't say juvenile.  So if

15   you can clear that up, I just -- it seems contrary to what the

16   PS3 report says.

17             MR. CRAWFORD:  Thank you, Your Honor.

18   BY MR. CRAWFORD:

19        Q    If you know, ma'am, has your son ever been to adult

20   court for a felony?

21        A    No, that was juvenile.

22        Q    It was juvenile?

23        A    Yes.  It should be.  You should probably call the

24   Court and see that.  But it was juvenile.

25        Q    That was back in 2011, right?

**BETTS - DIRECT/CRAWFORD**

1    A    Right.  It was juvenile.

2    Q    When he was 16 years of age?

3    A    Yes.

4    Q    Would you be willing, ma'am, should your son reside

5    at your home on home detention, to assist the Federal

6    probation office in monitoring his home detention?

7    A    Yes.

8    Q    And would you be willing to report, to your

9    knowledge, any transgressions or any violations of his

10   conditions of home detention?

11   A    Yes.

12       MR. CRAWFORD:  That's all the questions I have,

13   Judge.

14       THE COURT:  All right.  Thank you.

15       Mr. Blackington.

16       MR. BLACKINGTON:  May I just have a second, Your

17   Honor?

18       THE COURT:  Yes.

19       Mr. Martinez, do you know anything about that?  I

20   don't know if you do, but just do you know anything about that

21   conviction in 2011 if it's a juvenile?  You always all say and

22   the cause number reflects when it's a juvenile.  And it

23   doesn't say that.  Do you know anything about that?

24       PROBATION OFFICER:  Yes, Your Honor, typically that

25   is the case.  I'm actually reviewing the CCS right now for the

BETTS - CROSS/BLACKINGTON

1    case.  So far, from where I can see up to the conviction, it

2    does not appear that it was addressed as a matter of a

3    juvenile offense.  If I see any differently, I will certainly

4    let you know it, but...

5              THE COURT:  Okay.  Well, we will be here if you come

6    up with anything different.  Thank you.

7              All right.  Mr. Blackington, you may proceed.

8                        **CROSS EXAMINATION**

9    BY MR. BLACKINGTON:

10       Q    During the year of 2020, so last year, would you

11   either see your son or talk to him on pretty much a daily

12   basis every day?

13       A    Yes.

14       Q    Okay.  What about this year up to his arrest, would

15   you either see him or talk to him pretty much every day?

16       A    Because I'm his mother, yes.

17       Q    Okay.  You testified that he was doing work in

18   mobile detailing.  What is that?

19       A    Um, going to houses and detailing cars, washing

20   them.

21       Q    Okay.  Who did he work for?

22       A    I just know it was him and some of his friends.

23       Q    Okay.  Do you know --

24       A    I didn't get into who was there because I don't

25   know.  I didn't know he was doing mobile detailing washing

**BETTS - CROSS/BLACKINGTON**

1    cars.

2        Q    How did you know he was doing mobile detailing and

3    washing cars?

4        A    Because he told me he was.

5        Q    You never saw him at work?

6        A    No, he never -- no, I have not.

7        Q    Okay.  Has he ever kept guns at your house?

8        A    Guns at my house?

9        Q    Yes.

10       A    Not that I'm aware of.

11       Q    Pardon?

12       A    No, not as I know of.

13       Q    Has he ever kept money at your house in the last

14   couple years?  Let's say 2019, 2020, and 2021 has he ever kept

15   money at your house?

16       A    No, he never told me about money at my house.

17       Q    Okay.  And to your knowledge, he never kept money at

18   your house?

19       A    To my knowledge, yes.

20       Q    Did he ever have money at your house to your

21   knowledge?

22       A    No.

23       Q    Did he ever lose $10,000 at your house to your

24   knowledge?

25       A    He had told me something like that, that he had lost

**BETTS - CROSS/BLACKINGTON**

1   that amount, yes.

2        Q    Okay.

3        A    But I never found that amount.  And I don't know if

4   he was playing or not because he jokes all the time like he

5   has something else, so he could have been joking is why I'm

6   like I didn't see $10,000 or something.

7        Q    How many days a week was he working doing mobile

8   detailing?

9        A    Should be five times a day -- five days a week.

10       Q    9 to 5?

11       A    Usually how many days?  I said five days a week is

12   all I know of, but it could have been more.

13       Q    And how many hours a day?

14       A    I don't know.  Jason a grown man.  He don't -- I

15   don't know how -- I work myself, so I can't keep up with his

16   schedule.

17       Q    Okay.  Did you ever know of him to be involved in

18   drug dealing?

19       A    No.

20       Q    Did you ever provide information to him about people

21   who might be cooperating with the Federal government in drug

22   investigations?

23       A    No way --

24            MR. CRAWFORD:  Judge, I'm not this lady's lawyer,

25   but I'm not sure if she needs to be advised of any Sixth

**BETTS - CROSS/BLACKINGTON**

1   Amendment rights of counsel, and Fifth Amendment rights,

2   incriminating statements.

3              THE COURT:  Right.  What's your question again?

4              MR. BLACKINGTON:  So my question in that case was

5   whether she had provided Jason Betts with information about

6   people who might be cooperating with the Federal government.

7              THE COURT:  I think that's fair.  Your objection is

8   overruled, but obviously we have got to be careful about her

9   Fifth Amendment rights.

10             You can answer the question.  Do you remember the

11  question?

12             THE WITNESS:  Yeah. But can I plead the Fifth?

13             THE COURT:  You can plead the Fifth if it asks you

14  something that is incriminating about yourself.  I don't

15  believe that question asks you that.

16             THE WITNESS:  Oh.

17      A    Not to my knowledge, no.

18      Q    Not to your knowledge.

19             You had a son named -- and I may mispronounce it,

20  Won-won.

21      A    What does Jawon have to do with this?  He passed

22  away five months ago.

23      Q    Yes, and he passed away five months ago; is that

24  correct?

25      A    Yes.

**BETTS - CROSS/BLACKINGTON**

1    Q    Okay.  And he was shot, unfortunately?

2    A    He was what?

3    Q    He was shot?  He was killed?  Shot and killed?

4    A    Yes.

5    Q    Did you ever have any conversations your son in

6    which your son indicated he was going to retaliate against the

7    people who shot --

8    A    Of course you are going to do that and say that

9    because you are angry at that time.  That don't mean that you

10   are going to do anything.  I want anybody that had something

11   to do with my son.  I was angry.  I'd say anything when I'm

12   angry.  You would do the same if it was your child.  But I

13   don't know what this has to do with my son Jason Betts and

14   Dejuan.

15   Q    Did he discuss killing the people who he thought had

16   killed Juan?

17   A    We don't know who killed -- we don't know who really

18   killed him.  So everybody angry.  They will say anything when

19   they're angry.

20   Q    I understand people are angry.  My question was did

21   he ever discuss retaliating against the people whom he thought

22   killed your son?

23   A    Not to my knowledge he did not come out and say

24   that.

25            MR. BLACKINGTON:  Okay.  Your Honor, I would like to

**BETTS - CROSS/BLACKINGTON**

1    play some phone calls and ask some questions of her.

2              THE COURT:  Okay.

3              MR. BLACKINGTON:  Your Honor, for the record the

4    first call was on February 28th of this year at 6:23 p.m.

5                        (*The call was played at this time*)

6    BY MR. BLACKINGTON:

7        Q    Were you the female speaker in that telephone call?

8        A    It sound like me, yes.

9        Q    Who was the male speaker?

10       A    Who was talking?

11       Q    Yes?

12       A    Jason.

13       Q    Okay.  Who was the person that said:  I was trying

14   to come and get my gun?

15       A    It was Jason.

16       Q    Does that refresh your memory about whether he kept

17   guns at your house?

18       A    No, it still don't.

19       Q    Okay.  You said after -- after he said I was trying

20   to come and get my gun, you said, okay, I'm here.  Is that

21   correct?

22       A    Correct.

23       Q    And you said you were at home?

24       A    Yes, I -- yes.

25             MR. BLACKINGTON:  Okay.  The next call is -- was on

**BETTS - CROSS/BLACKINGTON**

1    March 3rd at 18:52.

2                    (*The call was played at this time*)

3    BY MR. BLACKINGTON:

4        Q    In that conversation, who was the female speaker in

5    that conversation?

6        A    I told you that was me before you even played the

7    tape.  I said that he had said he had lost 10,000.  I said

8    that before you even played that, so that -- and then in the

9    tape it said I told him he was lying, he ain't lost no

10   $10,000.

11       Q    And, in fact, he had said I had like 30,000 on me.

12   Is that correct?

13       A    He said he had 30.  I never said he had 30.  I kept

14   saying he was lying, if you listen to the tape once again.

15       Q    You think he was lying?

16       A    Yes, that what he do.

17       Q    He is a liar?

18       A    On certain times messing with me he do.  He always

19   says he has something if he didn't have it.  But I mean I

20   don't feel comfortable answering these questions.  I mean you

21   have got it on tape.  I sat there and told you he said he lost

22   $10,000 before you played that.  So you played exactly what I

23   told you he told me.

24       Q    Did he ever have drugs at your house?

25       A    Drugs at -- no.  No.  They came to my house before

**BETTS - CROSS/BLACKINGTON**

1   and got drugs out of a box from the post office.  I don't know

2   whose drugs were those.  I was taking them to the post office

3   when they got me.  But they was not Jason's drugs, no.  I

4   don't know whose drugs or whose stuff was in the box.

5        Q    So let me just break this down a little bit so we're

6   clear about what happened.  I'm not trying to trick you.  When

7   did this incident happen?

8             THE COURT:  Which incident?

9             MR. BLACKINGTON:  That she is talking about, people

10  about -- a package getting mailed to her house.

11       A    It was something that supposedly came to my house

12  when the Feds supposedly came to the house before.

13       Q    When was that?

14       A    That was a year or so ago.

15       Q    Okay.

16       A    But I don't know what was in the box or anything, so

17  I don't know if that is what you are talking about.  I don't

18  have any idea -- but I don't know anything about drugs coming

19  to my home, no.

20       Q    Okay.  So let's just -- and I'm not going to try to

21  trick you.  I just want to make sure we're clear where we are.

22  This happened about a year ago?

23       A    Correct, as I know of.

24       Q    And a package was mailed to your house?

25       A    It was a, it was a box delivered to my box, to my

**BETTS - CROSS/BLACKINGTON**

1    mailbox.

2        Q    Was it delivered by someone like Fed Ex or the

3    postal service or --

4        A    I don't know.  I was not --

5             MR. CRAWFORD:  Judge, I --

6             THE WITNESS:  Yeah, I don't feel --

7             MR. CRAWFORD:    -- object that this witness, I

8    think, needs to be advised of her Fifth Amendment rights.

9             THE COURT:  Yeah, okay.

10            MR. CRAWFORD:  We're going into criminal activity

11   here.

12            THE COURT:  I agree that if you're asking her if she

13   was receiving drugs, that's questions that impact her Fifth

14   Amendment right against self incrimination, so I will advise

15   you that to the extent that you are being asked something that

16   asks about your criminal activity --

17            THE WITNESS:  Plead the Fifth.

18            THE COURT:  Just a minute.  -- you have the right to

19   invoke the Fifth Amendment about those questions, and I

20   believe that question does go into that territory.  So if

21   that's something you want to invoke --

22            THE WITNESS:  Plead the Fifth.

23            THE COURT:  -- I will allow you to do so for that

24   question.  That doesn't mean all of your testimony.  It means

25   that question.

**BETTS - CROSS/BLACKINGTON**

1          THE WITNESS:  Right.

2          THE COURT:  Could you ask another question, please.

3    BY MR. BLACKINGTON:

4      Q    Let me ask you this, Ms. Betts, just so we don't

5    waste a bunch of time here.  If I ask you any other questions

6    about this package getting mailed to your house a year ago,

7    are you going to invoke the Fifth Amendment?

8      A    Plead the Fifth.

9      Q    Okay.  Apart from that incident, okay, have you been

10   aware of Jason bringing drugs to your house?

11     A    No.

12         MR. CRAWFORD:  Same admonishment, Judge.  It's --

13         THE COURT:  Well, I'm going to give him a little

14   leeway, though.  I mean she is -- as I understand it, the

15   allegation is or the suggestion is he should be released to be

16   in her home.  If he is bringing drugs into her home and she's

17   aware of that, that's something that goes to the issue of

18   release for detention.  Now, I have advised her of her Fifth

19   Amendment right, so that's up to her.  I'm going to let her

20   answer the question.

21         Did you get an answer?

22         Let him ask the question.

23         Did you get an answer to the question?  He objected,

24   so I didn't hear what she said.

25         MR. BLACKINGTON:  Yeah, I didn't either.  So can I

BETTS - CROSS/BLACKINGTON

1  re-ask it?

2          THE COURT:  Ask the question again.

3  BY MR. BLACKINGTON:

4      Q    Are you aware of Jason having drugs at your house?

5      A    No.

6      Q    Are you aware of him using drugs at your house?

7      A    Like what, marijuana or something?

8      Q    Marijuana is a drug.

9      A    No.  As I know of, no.  But marijuana, I don't -- I

10  don't know, no.

11     Q    Okay.  Are you aware of him keeping things like

12  cigars or whatever that are used -- that he intended to

13  possess to use marijuana at your house?

14     A    No, I have -- I have a nephew be there and they

15  have, like, marijuana package things, but it's not no -- I

16  guess it's only like a cigar or whatever.  I don't know.  I

17  don't use marijuana.  I don't have no idea.

18          MR. BLACKINGTON:  May I play a call, Your Honor?

19          THE COURT:  Yes.

20          MR. BLACKINGTON:  Okay.  This was one on March 4th

21  at 18:40, or 6:40, in the evening.  It's call 3867 on the

22  wire.

23          THE COURT:  What was the date again?

24          MR. BLACKINGTON:  It is March 4th.

25                  (*The call was played at this time*)

**BETTS - CROSS/BLACKINGTON**

1    Q    Were you ever asked, did you ever have a call with

2    Jason Betts --

3            THE COURT:  All right.  We're having a little

4    trouble with the echo.  But go ahead.

5    Q    Did you ever talk on the phone with Jason Betts when

6    he asked you if he had Swishers in his room at your house?

7    A    Yes.  Them is cigars.  Yes.

8    Q    And did he say -- and did you say they haven't been

9    in there, but you could bring some more?

10   A    Yes.

11   Q    Okay.  And did he say:  That is cool, I just stopped

12   over to roll up a blunt?

13   A    I don't know.  That's -- I don't know if he said

14   that part, but he could have.  I don't know.

15   Q    What is a blunt?

16   A    That is a -- that's a cigar.

17   Q    Is it a marijuana cigar?

18   A    It could be.

19   Q    Okay.  So it's possible that he asked you to help

20   him get something to roll a marijuana cigar?

21   A    It's a Swisher.

22           MR. BLACKINGTON:  I would also ask to play another

23   call which happened on March 16th at 1:13 in the evening.

24           THE COURT:  Did you say March 13th?

25           MR. BLACKINGTON:  March 16th at 1:13.

**BETTS - CROSS/BLACKINGTON**

1          THE COURT:  Okay.

2          MR. BLACKINGTON:  And I'm going to start it at the

3    one minute, seven second part of the call.

4                    (*The call was played at this time*)

5          MR. BLACKINGTON:  I'm going to pause it at the 2:25

6    mark and ask some more questions of you.

7    Q    In that call there was a female speaking.  Who was

8    that?

9    A    It was me.

10   Q    Who was the man that was speaking?

11   A    Jason.

12   Q    Okay.  And in that, you had told Jason that the Feds

13   picked up it sounded like Uncle Lynn?

14   A    My uncle, yes.

15   Q    What's his name?

16   A    Lynn.

17   Q    What is his last name?

18   A    Brown.

19   Q    Okay.  And what had -- I'm not familiar with the

20   case.  What was Lynn Brown arrested for?

21   A    He was arrested for, um -- he had too many

22   businesses I guess, but he was arrested for drugs a long time

23   ago.  He had just got out.

24   Q    Okay.  And then you had said on March 16th that the

25   Feds got Uncle Lynn yesterday.  Right?

BETTS - CROSS/BLACKINGTON

1    A    Correct.

2    Q    So what was he arrested for on March 15th of this

3    year?

4    A    Probation violation.

5    Q    Okay.

6    A    He supposedly went out of town.

7    Q    Okay.  And was the -- to your knowledge -- and if

8    you don't know, you don't know -- was the probation violation

9    for that drug offense?

10    A    I don't know.

11    Q    Okay.  Now, in that call then Jason asked why they

12    let him go.  Right?

13    A    Correct.

14    Q    Then he said:  I don't know, mom, people be --

15    you've got to be careful with people.  And you said:  I swear

16    to God.

17         What did you understand him to be saying when he

18    said you have got to be careful with people?

19    A    He knew his uncle was on probation and stuff, so

20    they -- someone probably took a picture of him and showed that

21    he was out of town so that way he mean you have got to be

22    careful with that type of stuff.

23    Q    So why were you telling Jason to be careful?

24    A    I did not hear myself tell Jason to be careful.

25    Q    What's that?

**BETTS - CROSS/BLACKINGTON**

1    A    I did not hear myself tell Jason to be careful.

2  Replay it for me.

3    Q    You did not say:  Gotta be careful with people?

4    A    No, I did not say that.

5    Q    All right.  And then you didn't say -- you didn't

6  hear -- did you hear Jason say:  You've just got to be careful

7  around that.  You know, when the Feds come, they know the Feds

8  are not gonna come and not score.

9         Is that correct?

10   A    Correct.

11   Q    And then later on in the conversation did you hear

12 Jason say:  You know we don't deal with him, though?  Did you

13 hear that?

14   A    No.

15   Q    Do you want me to play the call again so you can

16 hear it?

17   A    I mean you can play that as many times as you want.

18 I do not --

19        THE COURT:  I don't want you to play the call again.

20 This whole line of questioning is not helping.  I mean just --

21 I know you are trying to establish certain things with her,

22 but, as previously mentioned, there is Fifth Amendment issues,

23 she has got a Sixth Amendment right to counsel if she is being

24 prosecuted -- or being questioned by the prosecutor about

25 criminal activity.  This is just not that helpful, so -- you

**BETTS - CROSS/BLACKINGTON**

1    could put the agent on and he can testify all about what the

2    tapes say, but I'm uncomfortable about this continuing around

3    and around with this line of questioning with her, so...

4              MR. BLACKINGTON:  Okay.

5              THE COURT:  It's just not helpful.

6              MR. BLACKINGTON:  I would just like to ask one more

7    question of that phone call.

8    BY MR. BLACKINGTON:

9         Q    Did you hear Jason say be careful with who deal with

10   him?

11        A    No.

12        Q    You didn't hear that?

13        A    No.

14             MR. BLACKINGTON:  Okay.

15             THE COURT:  Do you have any cross exam you want to

16   have with this witness?

17             MR. CRAWFORD:  No, Your Honor.

18             THE COURT:  Okay.  You may step down.  Thank you

19   very much.

20                    *(Witness excused)*

21            * * * * * * * * * * * * * * * * * * * *

22

23

24

25

BETTS - CROSS/BLACKINGTON

1

2                    CERTIFICATE OF COURT REPORTER

3

4          I, Jodie Franzen, hereby certify that the

5    foregoing is a true and correct copy of the

6    transcript originally filed with the Clerk of Court

7    at Docket No. 454, and incorporating redactions of

8    personal identifiers determined by Bradley A.

9    Blackington, Assistant United States Attorney for

10   the Southern District of Indiana, and pursuant to

11   Rule 49.1 of the Federal Rules of Criminal Procedure

12   and Southern District of Indiana Rule 80-2.

13   Redacted characters appear as a black box in the

14   transcript.

15

16

17   /S/ Jodie Franzen

18   Official Court Reporter
     Southern District of Indiana
19   Indianapolis Division

20

21

22

23

24

25